No. 17-56081
_____

# In The
# United States Court of Appeals
# For The Ninth Circuit

_____

VIRGINIA DUNCAN, *et al.*,

*Plaintiffs-Appellees*,

v.

XAVIER BECERRA, in his official capacity as
Attorney General of the State of California,

*Defendant-Appellant*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
No. 17-cv-1017 (Hon. Roger T. Benitez, Senior District Judge)
_____

**BRIEF OF AMICUS CURIAE NATIONAL RIFLE
ASSOCIATION FREEDOM ACTION FOUNDATION IN
SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**
_____

David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
(202) 220-9600
dthompson@cooperkirk.com

*Counsel for Amicus Curiae*

_____

## CORPORATE DISCLOSURE STATEMENT

The National Rifle Association Freedom Action Foundation does not have a parent corporation, nor does any publicly held corporation own 10% or more of its stock.


Dated: January 12, 2018                     <u>s/ David H. Thompson</u>
                                            David H. Thompson

                                            *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... ii

INTEREST OF AMICUS ...................................................................1

INTRODUCTION ...............................................................................1

ARGUMENT ......................................................................................5

I.  The Second Amendment protects ownership of magazines holding more than ten rounds of ammunition. ......................................................5

    a.  Magazines holding more than ten rounds are commonplace and preferred by a vast population of citizens who use firearms for the lawful purpose of self-defense. ...............................................6

    b.  There is no exception to the Second Amendment for firearms that are "useful in military service." ...........................................9

II.  California's ban on magazines commonly owned for lawful purposes is unconstitutional under any level of heightened constitutional scrutiny. ........13

    a.  Because the right to bear arms is fundamental, California's ban should at a minimum be subject to strict scrutiny. .............................14

    b.  California's ban fails even intermediate scrutiny. .............................16

CONCLUSION ..................................................................................25

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Caetano v. Massachusetts*,
   136 S. Ct. 1027 (2016).........................................................................5, 6

*Center for Fair Pub. Policy v. Maricopa Cty.*,
   336 F.3d 1153 (9th Cir. 2003) ...........................................................17

*City of Los Angeles v. Alameda Books, Inc.*,
   535 U.S. 425 (2002)...............................................................16, 17, 18

*City of Renton v. Playtime Theatres, Inc.*,
   475 U.S. 41 (1986)..............................................................................17

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)............................... 1, 2, 3, 4, 5, 11, 12, 14, 15, 16

*Duncan v. Becerra*,
   265 F. Supp. 3d 1106 (S.D. Cal. 2017)......................................6, 8, 24

*Fyock v. Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015) ........................... 3, 4, 5, 6, 9, 10, 13, 24

*Heller v. District of Columbia*,
   670 F.3d. 1244 (D.C. Cir. 2011)..........................................................7

*Jackson v. City & Cty. of San Francisco*,
   746 F.3d 953 (9th Cir. 2014) .......................................................6, 14

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) ..................................6, 7, 9, 10, 12, 13

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010).........................................................................14

*Moore v. Madigan*,
   702 F.3d 933 (7th Cir. 2012) ..........................................................16

*NRA v. ATF*,
   700 F.3d 185 (5th Cir. 2012) ...........................................................15

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
   411 U.S. 1 (1973).............................................................................14

*Turner Broadcasting Systems, Inc. v. FCC*,
   520 U.S. 180 (1997).........................................................................15

*United States v. Chovan*,
735 F.3d 1127 (9th Cir. 2013) ...........................................................4, 5, 13, 18

*United States v. Marzzarella*,
614 F.3d 85 (3d Cir. 2010) ...............................................................15

*United States v. Virginia*,
518 U.S. 515 (1996)...........................................................................18

*Wrenn v. District of Columbia*,
864 F.3d 650 (D.C. Cir. 2017).........................................................16

**Statutes**

California Penal Code

§ 32310......................................................................................................2

§ 32310(c) ................................................................................................2

§ 32310(d) ...............................................................................................2

§ 32310(d)(1) ..........................................................................................2

§ 32310(d)(3) ..........................................................................................2

**Other**

NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN
FIREARMS AND THEIR VALUES (9th ed. 2007)....................................8

JIM GARRY, WEAPONS OF THE LEWIS & CLARK EXPEDITION (2012) ........................7

GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL
(2d ed. 2006) ...........................................................................23

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and
Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150
(1995)........................................................................................20

GUN DIGEST 2013 (Jerry Lee ed., 67th ed. 2012) .....................................6

INSTITUTE OF MEDICINE & NATIONAL RESEARCH COUNCIL, PRIORITIES FOR
RESEARCH TO REDUCE THE THREAT OF FIREARM-RELATED VIOLENCE
(Alan I. Leshner et al. eds., 2013), https://goo.gl/xHoZGu...............22

U.S. DEPARTMENT OF JUSTICE, ANTHONY J. PINIZZOTTO ET AL., VIOLENT
ENCOUNTERS (2006).........................................................................20

ARTHUR PIRKLE, 1 WINCHESTER LEVER ACTION REPEATING FIREARMS: THE
MODELS OF 1866 (1994) ........................................................................8

iii

U.S. BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2008 STATISTICAL TABLES (2010), https://goo.gl/gtWfuU ................8, 9

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW (Charles F. Wellford et al. eds., 2004)........................................................19, 21

HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST (1952) ...................................................................................................................8

JAMES D. WRIGHT & PETER H. ROSSI, ARMED & CONSIDERED DANGEROUS (2d ed. 2008) ...................................................................................................20

**INTEREST OF AMICUS**

The National Rifle Association Freedom Action Foundation ("Freedom Action Foundation") is a public charity dedicated to provision of non-partisan Second Amendment education to all American citizens. The Freedom Action Foundation's primary mission is to ensure that gun-owners are registered to vote and educated about issues that affect their fundamental rights. The Freedom Action Foundation has a strong interest in protecting the right of its members to possess firearms equipped with the standard-capacity ammunition magazines banned by California. All parties have consented to the filing of this brief.[1]

**INTRODUCTION**

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592 (2008). The right to armed self-defense, the Court made clear, "was the *central component* of [that] right"; and whatever else the Second Amendment might sanction or forbid, a law that reaches arms "in common use" and flatly bans law-abiding citizens from possessing them in the home—"where

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, the Freedom Action Foundation certifies that this brief was not written in whole or in part by counsel for any party, that no party or party's counsel made a monetary contribution to the preparation and submission of this brief, and that no person or entity other than the Freedom Action Foundation, its members, and its counsel has made such a monetary contribution.

the need for defense of self, family, and property is most acute"—is simply "off the table." *Id.* at 599, 627, 628, 636.

Stubbornly ignoring *Heller*'s teaching, California has enacted just such a law. California Penal Code Section 32310 bans the possession, even in the home, of any firearm magazine capable of holding more than ten rounds. Magazines of this size are ubiquitous. There are tens if not hundreds of millions of them in the United States, they are legal in the vast majority of States, and they come standard with many of the Nation's most popular firearms. Under Section 32310, however, anyone in possession of one of these standard-capacity magazines must remove it from the State, *id.* § 32310(d), sell their magazine to a licensed firearm dealer, *id.* § 32310(d)(1), or forfeit their magazine to the State, who will oversee its destruction, *id.* § 32310(d)(3). If a citizen of California wishes to keep their lawfully obtained property, they will face criminal penalties of a fine up to $100 per magazine, one year of imprisonment in the county jail, or both. *Id.* § 32310(c).

Plaintiffs—a group of law-abiding California residents who wish to keep the banned magazines in their homes for self-defense—challenged California's ban as unconstitutional under the Second Amendment. The District Court for the Southern District of California preliminarily enjoined enforcement of the ban, thus allowing those who have lawfully obtained a prohibited magazine to continue to possess it until the constitutionality of the ban is adjudicated. The plaintiffs are likely to

succeed, the District Court concluded, because the magazines banned by California are squarely protected by the Second Amendment, and California's ban cannot pass even intermediate scrutiny.

This is not this Court's first encounter with a ban on magazines capable of holding more than ten rounds, and its previous decision on the subject dictates that the District Court's opinion must be affirmed. In *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), this Court dealt with a local ordinance banning the same class of magazines as the statewide law challenged in this case. While the district court in *Fyock* declined to grant a preliminary injunction against that ordinance, and this Court affirmed that ruling, the analytical guideposts it laid out in that decision demonstrate that the preliminary injunction entered in this case must stand.

This Court's reasoning in *Fyock* forecloses California's arguments on appeal at every turn. California first maintains that the banned magazines are "not within the purview of the Second Amendment," Appellant's Opening Brief at 28 n.7 (Oct. 12, 2017), ECF No. 12 ("Appellant's Br."), because they fall within *Heller*'s dictum that "dangerous and unusual weapons" that are not "in common use at the time" fall outside the Second Amendment's scope, *Heller*, 554 U.S. at 627. But *Fyock* plainly disposes of that contention. There, this Court upheld the district court's conclusions that the banned magazines "are in common use," and that "a regulation restricting

[their] possession . . . burdens conduct falling within the scope of the Second Amendment." *Fyock*, 779 F.3d at 998. The result can be no different in this case.

Next, California argues that this Court should apply only intermediate scrutiny and that its ban "easily passes scrutiny under this framework." Appellant's Br. 33–34. Not so. To begin, since California's law flatly bans conduct that lies at the very core of the Second Amendment's protections—"the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S. 635—under this Circuit's precedent, it should at a minimum be subjected to strict scrutiny. *See United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013). But even assuming intermediate scrutiny applies, the injunction entered below must be affirmed, and this Court's decision in *Fyock* shows why. There, this Court emphasized the "limitations" imposed by law on an interlocutory appeal of a preliminary injunction and "the narrow scope of . . . review," in such an appeal. *Fyock*, 779 F.3d at 995. Accordingly, in *Fyock* this Court was "[m]indful of our task to determine only whether the district court correctly distilled the applicable rules of law and exercised permissible discretion in applying those rules to the facts at hand"; and once it determined that the lower-court's opinion passed this test, it refused "to re-weigh the evidence and overturn the district court's evidentiary determinations— in effect, to substitute our discretion for that of the district court." *Id.* at 995, 1000. The "district court's weighing of the evidence [and] credibility determinations" are

4

no more "clearly erroneous" in this case than in *Fyock*. *Id.* at 1001. Its preliminary injunction should be affirmed.

## ARGUMENT

In assessing a Second Amendment challenge, this Court undertakes a "two-step inquiry," which first "asks whether the challenged law burdens conduct protected by the Second Amendment" and second, "if so, directs courts to apply an appropriate level of scrutiny." *Chovan*, 735 F.3d at 1136. Here, the conduct banned by California—the possession of widely owned, standard-capacity magazines—is squarely within the Second Amendment's protective confines. And California's ban on possessing these magazines fails any level of heightened constitutional scrutiny.

## I. The Second Amendment protects ownership of magazines holding more than ten rounds of ammunition.

In *Heller* the Supreme Court laid down an explicit and unambiguous rule defining the firearms that citizens have a Second Amendment "right to keep and bear": firearms that are "typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 625. Put another way, the Constitution guarantees the right to keep and bear firearms that are " 'in common use at the time' for lawful purposes like self-defense." *Id.* at 624. By contrast, the Second Amendment does not extend to "dangerous and unusual weapons" that are "not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625, 627. "[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v.*

5

*Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito, J., concurring). Here, the District Court correctly found that the magazines banned by California are in common use; and this Court's decision in *Fyock* forecloses California's attempts to undermine that conclusion.[2]

### a. Magazines holding more than ten rounds are commonplace and preferred by a vast population of citizens who use firearms for the lawful purpose of self-defense.

The District Court properly recognized that magazines capable of holding more than ten rounds of ammunition are in common use. *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 2017 WL 2813727, at *7 (S.D. Cal. 2017). Such magazines are common to the point of ubiquity among the law-abiding gun owners of this country. Indeed, calling these devices "large capacity" magazines is an utter misnomer—they are a standard feature on many of this nation's most popular firearms.

For example, in a recent edition of Gun Digest, a standard reference work that includes specifications of currently available firearms, about two-thirds of the distinct models of semiautomatic centerfire rifles are normally sold with standard magazines that hold more than ten rounds of ammunition.  GUN DIGEST 2013 455–64, 497–99 (Jerry Lee ed., 67th ed. 2012). In fact, the AR-15, which typically comes

---

[2] While ammunition magazines are not themselves firearms, this Court's precedent makes clear that "without bullets, the right to bear arms would be meaningless." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). A ban on magazines is thus no more constitutional than a ban on the arms themselves. *See id.*; *Fyock*, 779 F.3d at 998.

standard with a 20- or 30-round magazine, is "the most popular civilian rifle design in America." *Kolbe v. Hogan*, 849 F.3d 114, 128–29 (4th Cir. 2017). Magazines capable of holding more than ten rounds are also standard on many of this nation's most popular handgun models. *See id.* at 129 ("Most pistols are manufactured with magazines holding ten to seventeen rounds . . . .").

According to the record evidence in this case, there are approximately 115 million magazines that hold 11 rounds or more extant in the United States today. ER2422. That is nearly one such magazine for every two adults in the Nation, and approximately *half* of the total stock of magazines in the United States. *Id.* As the D.C. Circuit put the point, "[t]here may well be some capacity above which magazines are not in common use but, if so, . . . that capacity surely is not ten." *Heller v. District of Columbia*, 670 F.3d. 1244, 1261 (D.C. Cir. 2011) ("*Heller II*").

Magazines capable of holding more than ten rounds have long been in existence, and have traditionally been regarded as lawful possessions. Indeed, such magazines are at least as old as the Second Amendment itself. The Girandoni air rifle was in existence at the time of the Amendment's drafting, and it had a magazine capable of holding twenty rounds; Merriweather Lewis carried one on the Lewis and Clark expedition. *See* JIM GARRY, WEAPONS OF THE LEWIS & CLARK EXPEDITION 95–96, 99–100 (2012). Many lever-action rifles with magazines capable of holding more than ten rounds were introduced around the time of the adoption of the

7

Fourteenth Amendment, including models produced by the Volcanic Repeating Arms Company in the 1850s, Henry in the 1860s, and Winchester in the 1860s and 1870s. *See* HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 13 (1952); NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 304–06 (9th ed. 2007); ARTHUR PIRKLE, 1 WINCHESTER LEVER ACTION REPEATING FIREARMS: THE MODELS OF 1866, 1873 & 1876 44 (1994).

As the District Court found, these standard-capacity magazines are also "useful for self-defense by law-abiding citizens." *Duncan*, 2017 WL 2813727, at *7. Indeed, there are many reasons why a law-abiding citizen would not want to be limited to substandard capacity ammunition magazines. The most obvious is to decrease the risk of running out of ammunition before being able to repel a criminal attack. It is no answer to say that the average gun owner is unlikely to need to fire more than ten rounds to protect himself. The average gun owner often will not need to fire a *single* round in self-defense, but that does not justify banning guns altogether. And if a gun owner is attacked, there is a good chance he will be attacked by multiple offenders. According to the most recent survey-data from the Bureau of Justice Statistics, for example, in 2008 nearly 800,000 violent crimes (17.4% of the total) involved multiple offenders. U.S. BUREAU OF JUSTICE STATISTICS, CRIMINAL

VICTIMIZATION IN THE UNITED STATES, 2008 STATISTICAL TABLES tbl. 37 (2010), https://goo.gl/gtWfuU.

In the face of all of this evidence, California nonetheless argues that these magazines "are not within the purview of the Second Amendment." Appellant's Br. 28 n.7. But that argument is squarely foreclosed by this Court's decision in *Fyock*. In that case, the court below had, like the District Court here, concluded that magazines with a capacity of ten or more rounds "are in common use" and thus "fall[ ] within the scope of the Second Amendment"—based on evidence and studies similar to the ones in the record in this case. *Fyock*, 779 F.3d at 998. This Court affirmed that holding, reasoning that the lower court "applied the appropriate legal principles and did not clearly err in finding, based on the record before it, that [the magazines in question] fall[ ] within the scope of the Second Amendment." *Id.* It necessarily follows that the district court did not err in this case by reaching the same conclusion.

### b. There is no exception to the Second Amendment for firearms that are "useful in military service."

On appeal, California asks this Court to hold that even if the magazines in question are commonly used for lawful purposes, they are nonetheless outside the scope of the Second Amendment because they are "most useful in military service." Appellant's Br. 27. That argument is based on the Fourth Circuit's recent *en banc* decision in *Kolbe*, holding that if firearms or magazines "are 'like' 'M-16 rifles'—

'weapons that are most useful in military service'—they are among those arms that the Second Amendment does not shield." 849 F.3d at 135 (quoting *Heller*, 554 U.S. at 627). This Court should decline California's invitation to follow the Fourth Circuit into error.

To begin, this argument, too, is foreclosed by this Court's precedent. In *Fyock*, as in this case, the defendant pressed the argument that the standard-capacity magazines in question were "outside the scope of the Second Amendment" because they "are 'dangerous and unusual weapons,' " 779 F.3d at 997—the same exception to the Second Amendment relied upon by the Fourth Circuit in *Kolbe*. *See* 849 F.3d at 36–38. But as noted above, in *Fyock* this Court *rejected* that argument, instead affirming the district court's holding that a ban on the standard-capacity magazines in question "burdens conduct falling within the scope of the Second Amendment," and noting that the lower court had reached that conclusion after "appl[ying] the appropriate legal principles." *Fyock*, 779 F.3d at 998. That holding is directly contrary to the Fourth Circuit's conclusion that magazines capable of holding ten rounds or more, like fully-automatic firearms, "are not constitutionally protected." *Kolbe*, 849 F.3d at 137. It is thus too late in the day for California to argue that the magazines it bans are "dangerous and unusual" because they are "useful in military service." Appellant's Br. 27.

10

Even if it were not foreclosed by this Court's decision in *Fyock*, California's argument fails on the merits, for *Kolbe*'s "useful in military service" test is flatly contrary to the Second Amendment and the binding Supreme Court precedent interpreting it.

As the Supreme Court held in *Heller*, the term "Arms" in the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. By announcing the purpose for which the pre-existing right to keep and bear arms was codified, *id.* at 599 ("to prevent elimination of the militia"), the prefatory clause clarifies but "does not limit or expand the scope" of the right so codified, *id* at 578. Because "[t]he traditional militia was formed from a pool of men bringing arms in common use at the time for lawful purposes like self-defense," *id.* at 624 (quotation marks omitted), it follows that "arms in common use at the time for lawful purposes" lie at the core of the Second Amendment. *See id.* at 627.

By contrast, *Heller* clarified, those weapons that are "dangerous and unusual"—and thus, by definition, are *not* in common use for lawful purposes—are outside the Second Amendment's scope. *Id.* at 627. In the course of explaining this distinction, the Supreme Court noted and rebutted a potential objection to this line: "that if weapons that are most useful in military service—M–16 rifles and the like— may be banned, then the Second Amendment right is completely detached from the prefatory clause." *Id.* That objection, the Court concluded, failed because while an

11

effective modern militia may "require sophisticated arms that are highly unusual in society at large," that modern development "cannot change our interpretation of the right." *Id.* at 627–28.

The Fourth Circuit's decision in *Kolbe* purports to be based on the Supreme Court's decision in *Heller*, but it in fact badly misreads the Court's opinion. *Kolbe* zeroes in on the Court's oblique reference to "M-16 rifles and the like" and attempts to transform it into the cornerstone of *Heller*'s analysis of the Second Amendment's scope. By this aside, *Kolbe* opines, "*Heller* drew a 'bright line' . . . between weapons that are most useful in military service and those that are not." 849 F.3d at 137. But the full context of *Heller*'s statement concerning "M–16 rifles and the like" makes it clear that the Court was not recognizing a free-standing exception to the scope of the Second Amendment. Instead, it was attempting to justify the fact that the historically based exclusion of weapons that are not in common use may result in the prohibition of the very arms that are most useful for modern military service.

Indeed, *Kolbe*'s "useful in military service" test flips the Second Amendment on its head. As Judge Traxler noted in dissent in that case, under that test "a settler's musket, the only weapon he would likely own and bring to militia service, would be most useful in military service—undoubtedly a weapon of war—and therefore not protected by the Second Amendment." 849 F.3d at 156 (Traxler, J., dissenting). That simply cannot be. Indeed, the Fourth Circuit's deeply flawed test would *gut* the

12

Second Amendment, since "nearly all firearms can be useful in military service," *id.* at 157, making the class of firearms protected by the Constitution under *Kolbe*'s test virtually empty.

This Court should decline California's request that it adopt a radical test that is flatly contrary to *Heller* and that would drain the Second Amendment of essentially any meaning. Instead, it should adhere to its decision in *Fyock* that the magazines in question "fall[ ] within the scope of the Second Amendment." 779 F.3d at 998.

## II. California's ban on magazines commonly owned for lawful purposes is unconstitutional under any level of heightened constitutional scrutiny.

Because California's ban limits conduct protected by the Second Amendment, the Court must determine, under this Circuit's precedent, what level of constitutional scrutiny applies and whether the ban can survive it. *See Chovan*, 735 F.3d at 1136. Because California has flatly banned conduct that lies at the core of the Second Amendment—the possession of common firearms for self-defense in the home— Amicus submits that, as in *Heller*, the ban is categorically unconstitutional or, at a minimum, strict scrutiny must apply. But the Court ultimately need not resolve this issue, because California's law cannot satisfy even intermediate scrutiny, the most lenient test that potentially could apply.

### a. Because the right to bear arms is fundamental, California's ban should at a minimum be subject to strict scrutiny.

Because California's ban flatly forbids law-abiding citizens from possessing common arms and using them in the home for self-defense, it must at least be justified as necessary to advance the most compelling of government interests. It is well established, after all, that "strict judicial scrutiny [is] required" if a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only specifically enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald v. City of Chicago*, 561 U.S. 742, 768, 778 (2010).

Strict scrutiny is also called for under this Circuit's precedent. To determine the correct level of scrutiny, this Court's cases "consider how close [the challenged restriction] is to the core of the Second Amendment right, and the severity of its burden on that right." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014). Both factors dictate that the strictest scrutiny must apply. California's ban reaches the very heartland of the Second Amendment's protections, limiting the possession of common arms even for the purpose of self-defense—"the *central component*" of the right to keep and bear arms, *Heller*, 554 U.S. at 599—and even in the home—"where the need for defense of self, family, and property is most

14

acute," *id.* at 628. And the burden it imposes on these core rights is the most severe kind possible—a flat ban on even possessing commonly used arms *under any circumstances*.

Other courts have recognized that where a law bans the Second Amendment's core guarantee of lawful possession of a firearm within the home, only strict scrutiny is appropriate. *See, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010) (applying "intermediate, rather than strict, scrutiny" because the challenged law "was neither designed to nor has the effect of prohibiting the possession of any class of firearms"); *NRA v. ATF*, 700 F.3d 185, 195 (5th Cir. 2012) ("A regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family—triggers strict scrutiny." (citations omitted)). And indeed, *Heller* itself forecloses the application of intermediate scrutiny here. While Justice Breyer—in *dissent*—urged the Court to craft a doctrinal test drawn from "cases applying intermediate scrutiny" in the First Amendment context, such as *Turner Broadcasting Systems, Inc. v. FCC*, 520 U.S. 180 (1997), *Heller*, 554 U.S. at 704 (Breyer, J., dissenting), the *Heller* majority deliberately *rejected* that suggestion, *id.* at 634–35 (majority opinion).

Indeed, the *Heller* majority eschewed levels of scrutiny altogether, categorically invalidating the District of Columbia's bans on possession of handguns

15

and operable long guns in the home. Following *Heller*'s lead, other courts that typically apply a two-step test similar to this Court's have nevertheless categorically invalidated laws that banned typical citizens from exercising their core Second Amendment rights. *See Wrenn v. District of Columbia*, 864 F.3d 650, 666–67 (D.C. Cir. 2017); *Moore v. Madigan*, 702 F.3d 933, 941 (7th Cir. 2012). That is the approach that would be most faithful to *Heller* in this case.

### b. California's ban fails even intermediate scrutiny.

Ultimately, however, this case does not depend on the level of scrutiny applied, because California's ban fails even intermediate scrutiny, which is the most lenient standard that possibly could be applied. *See Heller*, 554 U.S. at 628 n.27 (rejecting rational basis review).

1. California's law necessarily fails intermediate scrutiny at the threshold because the ban seeks to reduce gun violence only by reducing the *quantity* of the banned magazines. Under the Second Amendment, that is not a permissible goal— even if that goal is used as a means to the further end of increasing public safety. That conclusion follows directly from the Supreme Court's precedents in the secondary-effects area of free speech doctrine. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (plurality).

In the First Amendment context, courts will analyze some government restrictions on certain types of constitutionally protected conduct—most commonly,

local regulation of establishments engaged in the exhibition or sale of non-obscene adult films, products, or performances—under merely intermediate scrutiny even though they are technically content-based, so long as the purpose of the restrictions is to reduce the negative secondary effects of the expression—such as the increased crime that occurs in neighborhoods with a high concentration of adult theatres— rather than to suppress the expression itself. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–51 (1986).

However, as made clear in Justice Kennedy's separate opinion in *Alameda Books*—which, as this Court has recognized, has controlling precedential effect, *Center for Fair Pub. Policy v. Maricopa Cty.*, 336 F.3d 1153, 1161 (9th Cir. 2003)— this limitation on acceptable purposes has implications for the way the intermediate-scrutiny analysis is conducted. For in showing how its restriction is narrowly tailored to further an important or substantial governmental interest, part of the government's reasoning cannot be "that it will reduce secondary effects by reducing speech in the same proportion." *Alameda Books*, 535 U.S. at 449 (Kennedy, J., concurring).

California's law plainly violates this principle. Because it is a flat ban on the possession of constitutionally protected arms, any reduction of gun crime that it accomplishes will necessarily be a mere byproduct of the law's central design and function: reducing the quantity of lawfully-possessed magazines. Under Justice

17

Kennedy's controlling opinion in *Alameda Books*, that line of reasoning is impermissible—under *any* level of heightened scrutiny.

2. Even setting this point aside, California's ban fails intermediate scrutiny on the merits. Under that standard, California's ban must be "supported by an important government interest and substantially related to that interest." *Chovan*, 735 F.3d at 1141. "The burden of justification is demanding and it rests entirely on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996). And the Government cannot "get away with shoddy data or reasoning." *Alameda Books*, 535 U.S. at 438 (plurality). For multiple reasons, California does not meet this test.

There is no empirical evidence for the proposition that "large capacity" magazine bans advance public safety. A federal statute banned the same magazines as California between 1994 and 2004, and as Professor Koper—a social scientist whose work on gun control is repeatedly cited by California—recently acknowledged, his research for the Department of Justice on the 10-year federal ban "showed no discernable reduction in the lethality or injuriousness of gun violence" while the ban was in effect. ER2018. Professor Koper's initial report on the ban for the Department of Justice "found no statistical evidence of post-ban decreases in either the number of victims per gun homicide incident, the number of gunshot wounds per victim, or the proportion of gunshot victims with multiple wounds." ER1901. His final report concluded that the ban could not be "clearly credit[ed] . . .

18

with any of the nation's recent drop in gun violence" and that "[s]hould it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement." ER1408–09. Professor Koper also acknowledged "studies suggest[ing] that state-level [magazine] bans have not reduced crime." ER1487 n.95.

The failure of the federal magazine ban to have *any* discernible effect on gun violence has been confirmed by the National Research Council ("NRC"), which conducted a comprehensive review of *all* the published literature on firearms violence, including Professor Koper's research. The NRC explained that "the premise of the ban" on magazines holding more than ten rounds "was that a decrease in their use may reduce gunshot victimization, particularly victimizations involving multiple wounds or multiple victims"—but in fact the data "did not reveal any clear impacts on gun violence outcomes." NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 96–97 (Charles F. Wellford et al. eds., 2004).

What is more, there is an obvious reason why California's ban necessarily will be *less* effective than the federal ban in curtailing criminal access to "large capacity" magazines: the banned items continue to be legal in the vast majority of the States that do not have laws similar to California's. As Professor Koper has acknowledged, "the impact of [state bans such as these] is likely undermined to

19

some degree by the influx of [prohibited items] from other states . . . ." ER1487 n.95.

The lack of evidence that bans like California's have improved public safety should not be surprising. It is highly unlikely that such prohibitions will deter any violent criminal from using a banned magazine, for the simple reason that "most of the methods through which criminals acquire guns and virtually everything they ever do with those guns are *already* against the law." JAMES D. WRIGHT & PETER H. ROSSI, ARMED & CONSIDERED DANGEROUS xxxv (2d ed. 2008)); *see also* U.S. DEPARTMENT OF JUSTICE, ANTHONY J. PINIZZOTTO ET AL., VIOLENT ENCOUNTERS 50 (2006) (97% of handguns used to assault law enforcement officers participating in study were acquired illegally).

Unlike criminals, of course, law-abiding citizens, by definition, will obey the law. This means that California's ban will actually *impair* public safety to the extent it deprives law-abiding citizens of ammunition capacity that criminals will continue to employ. Indeed, defensive gun uses "are about three to five times as common as criminal uses, even using generous estimates of gun crimes." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 170 (1995). And, as explained above, there are valid reasons why law-abiding citizens may prefer to possess the magazines banned by California for self-defense, and millions of

20

Americans have indeed chosen to possess them. Even assuming that California's ban *did* somehow reduce the incidence or severity of firearm crimes, the State has done *nothing* to show that any such public safety gains would *outweigh* the real public safety *cost* of depriving its citizens of an effective means of self-defense.

The most likely and logical result of the Act is thus to deprive law-abiding citizens of firearms and magazines that criminals will continue to use. But even if this were not the case, California *still* would not be able to show that it would be reasonable to expect its ban to advance public safety to any appreciable degree. As an initial matter, what was true of the federal ban is also true of California's: "the maximum potential effect of the ban on gun violence outcomes [is] very small." NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE, *supra*, at 97. Magazines holding more than ten rounds of ammunition are simply irrelevant for most gun crimes. As Professor Koper has acknowledged, "available studies on shots fired show that assailants fire less than four shots on average, a number well within the 10-round magazine limit." ER1496 (citation omitted); *see also* ER2436–37 (Kleck Declaration).

California argues that standard-capacity magazines "feature prominently in . . . mass shootings," Appellant's Br. 1, but as tragic as these heinous crimes are, the State has failed to show that its ban will do *anything* to reduce their incidence or severity.

21

Mass shootings are, as Professor Koper acknowledges, "particularly rare events." ER2019. As the National Research Council recently reported, although mass killings "are a highly visible and moving tragedy," they are statistically so rare that "there is no conclusive information about which policies and enforcement and prevention strategies might be effective" in reducing their number and severity. INSTITUTE OF MEDICINE & NATIONAL RESEARCH COUNCIL, PRIORITIES FOR RESEARCH TO REDUCE THE THREAT OF FIREARM-RELATED VIOLENCE 31, 47 (Alan I. Leshner et al. eds., 2013), https://goo.gl/xHoZGu. Focusing on mass shootings thus highlights the minimal impact California's ban is likely to have on the vast majority of violent crime. But as rare as mass shootings are, much rarer still are mass shootings that would be affected by criminals obeying California's ban.

The root difficulty is that a criminal bent on mass murder can easily circumvent California's ban by carrying additional firearms or multiple ten-round magazines—steps which many mass shooters *already take*. California's theory, of course, is that mass shooters with larger magazines are able to fire more shots than mass shooters with smaller magazines. To support this proposition, California repeatedly asserts that when mass shooters use "large capacity" magazines, there are "more injuries, more fatalities, and higher rates of death than crimes involving firearms with [smaller] magazines." Appellant's Br. 1. But even if this is true (as Professor Koper acknowledges, shortcomings in available data make studying

mass shootings particularly challenging, ER2019), it does not show that these mass shooters were able to commit their atrocities *because* they used "large capacity" magazines. The more likely explanation is that these shooters *chose* such magazines because they intended to shoot a lot of people. And if that is the case, had these shooters been thwarted in obtaining "large capacity" magazines they could have compensated by carrying additional smaller magazines or additional guns.

Empirical evidence supports this proposition. For example, a study of incidents from 1984 to 1993 in which "six or more victims were shot dead with a gun, or twelve or more total were wounded" found that "[f]or those incidents where the number of rounds fired and the duration of the shooting were both reported, the rate of fire never was faster than about one round every two seconds, and was usually much slower than that." GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 124–25 (2d ed. 2006). "None of the mass killers maintained a sustained rate of fire that could not also have been maintained—even taking reloading time into account—with either multiple guns or with an ordinary six-shot revolver and the common loading devices known as 'speedloaders.' " *Id*. at 125. Finally, a criminal with multiple guns can avoid the need to reload by changing guns when the first gun runs out of ammunition. The perpetrators of a majority of mass shootings between 1984 and 1993 carried multiple firearms. *Id.* at 125, 144 tbl. 4.2.

23

California's evidence indicates that the same is true for mass shootings since 1993. ER185–87 (41 out of 70 mass shootings since 1994, or 58.5%, involved more than one firearm).

In *Fyock*, this Court stressed the "narrow scope of . . . review" in "interlocutory appeals" like this one: "our task [is] to determine only whether the district court correctly distilled the applicable rules of law and exercised permissible discretion in applying those rules to the facts at hand . . . ." 779 F.3d at 995. Here, the District Court, after considering the extensive evidence submitted by both parties, concluded that California's ban "do[es] not provide a reasonable fit to accomplish California's important goal of protecting the public from violent gun crime." *Duncan*, 2017 WL 2813727, at *16. As in *Fyock*, this Court should "decline to substitute [its] own discretion for that of the district court." 779 F.3d at 1001.

24

## CONCLUSION

For the foregoing reasons, the District Court's preliminary injunction should be affirmed.

Dated: January 12, 2018        Respectfully submitted,

<u>s/ David H. Thompson</u>
David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C.  20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: dthompson@cooperkirk.com

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of F<small>ED</small>. R. A<small>PP</small>. P. 29(a)(5) because it contains 5,792 words, excluding the parts of the brief exempted by F<small>ED</small>. R. A<small>PP</small>. P. 32(f).

This brief complies with the typeface requirements of F<small>ED</small>. R. A<small>PP</small>. P. 32(a)(5) and the type-style requirements of F<small>ED</small>. R. A<small>PP</small>. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Dated: January 12, 2018         s/ David H. Thompson
David H. Thompson

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 12, 2018. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: January 12, 2018                          s/ David H. Thompson
                                                  David H. Thompson

                                                  *Counsel for Amicus Curiae*