No. 17-56081

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
————————————————

VIRGINIA DUNCAN *et al.*,
*Plaintiffs-Appellees,*
*v.*
XAVIER BECERRA,
in his official capacity as Attorney General
of the State of California,
*Defendant-Appellant*
————————————————

On Appeal from the United States District Court
for the Southern District of California

No. 17-cv-1017-BEN-JLB
The Honorable Roger T. Benitez, Judge
————————————————

BRIEF OF *AMICI CURIAE* LAW ENFORCEMENT GROUPS
AND STATE AND LOCAL FIREARMS RIGHTS GROUPS
IN SUPPORT OF PLAINTIFFS-APPELLEES
(*AMICI* LISTED ON INSIDE COVER)
————————————————

Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
Telephone: (703) 352-7276
dan@danpetersonlaw.com

January 12, 2018                    Counsel for *Amici Curiae*

The following law enforcement groups and state and local firearms rights groups are *amici curiae* in this case: California State Sheriffs' Association, Western States Sheriffs' Association, California Reserve Peace Officers Association, San Francisco Veteran Police Officers Association, California Gang Investigators Association, International Law Enforcement Educators and Trainers Association, Law Enforcement Legal Defense Fund, Law Enforcement Action Network, Law Enforcement Alliance of America, International Association of Law Enforcement Firearms Instructors, Association of New Jersey Rifle & Pistol Clubs, Bridgeville Rifle & Pistol Club, Connecticut Citizens Defense League, Delaware State Sportsmen's Association, Gun Owners' Action League Massachusetts, Gun Owners of California, Hawaii Rifle Association, Illinois State Rifle Association, Missourians for Personal Safety, New York State Rifle & Pistol Association, Vermont Federation of Sportsmen's Clubs, Vermont State Rifle & Pistol Association, Virginia Shooting Sports Association, and Western Missouri Shooters Alliance.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iii

CORPORATE DISCLOSURE STATEMENT .........................................................1

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................1

SUMMARY OF ARGUMENT ................................................................4

ARGUMENT .........................................................................6

I.  SECTION 32310 WILL NOT REDUCE VIOLENT CRIME
AND WILL INCREASE THE DANGER TO VICTIMS OF
CRIMINAL ATTACK.........................................................................7

A.  Magazines holding more than 10 rounds are not "large capacity"
but are standard-issue on commonly owned, lawfully possessed pistols
and rifles.........................................................................7

B.  A ban on magazines already possessed will not increase public
safety because it will affect only the law-abiding.....................................11

C.  The magazine ban will jeopardize the ability of citizens to defend
themselves against criminal attack.........................................................13

D.  Law enforcement professionals overwhelmingly recognize that
magazine bans are not effective in fighting crime .....................................18

II.  THE STATE HAS NOT SHOWN THAT BANNING POSSESSION
OF MAGAZINES HOLDING OVER 10 ROUNDS WILL REDUCE
MASS SHOOTINGS OR THEIR LETHALITY  .....................................19

A.  Studies relied on by the State's brief do not show that such
magazines are over-represented in mass shootings .....................................19

i

B.  Law enforcement professionals agree that restrictions on
 magazines would be ineffective in reducing mass shootings ..................................26

III.  THE BANNED MAGAZINES ARE NOT
DISPROPORTIONATELY USED IN ATTACKS
ON LAW ENFORCEMENT OFFICERS  ............................................................26

CONCLUSION ........................................................................................................30

CERTIFICATE OF COMPLIANCE .......................................................................31

CERTIFICATE OF SERVICE ...............................................................................32

# TABLE OF AUTHORITIES

**Page**

## CASES

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................6

*McDonald v.City of Chicago*, 561 U.S. 742 (2010) ..................................................6

## CONSTITUTIONS, STATUTES, AND REGULATIONS

U.S. Const., Amend. II..................................................................6, 24, 25, 27

18 U.S.C. § 922(w)(1) (repealed) .............................................................11

Pub. L. 103-322, § 110103
108 Stat. 1796 (Sep. 13, 1994)...................................................................11

Cal. Penal Code § 32310.................................................................6, 7, 12

Cal. Penal Code § 32310(a) ...................................................................11

## OTHER AUTHORITIES

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, FIREARMS
COMMERCE IN THE UNITED STATES: ANNUAL STATISTICAL UPDATE 2017 ...............9

CNN Library, *September 11th Fast Facts* ...............................................24

COOK, PHILIP & LUDWIG, JENS, GUNS IN AMERICA: RESULTS
OF A COMPREHENSIVE NATIONAL SURVEY OF FIREARMS
OWNERSHIP AND USE (1996) ...................................................................14

Cook, Philip J. *et al.*, *The Gun Debate's New Mythical Number: How Many Defensive Uses Per Year?*, 16 J. Pol'y Analysis & Mgmt. 463 (1997) .......................................................14

Dotinga, Randy, *America's deadliest school violence? Not Columbine, but Bath, Mich., in 1927*, CHRISTIAN SCIENCE MONITOR (Jul. 24, 2012)..........................................................24

ENCYCLOPÆDIA BRITANNICA, "*Oklahoma City bombing*," .....................................24

Hayes, Christal, *Number of officers killed hits 2nd-lowest in more than 50 years,* USA TODAY, (Dec. 29, 2017)..............................................28

Kleck, Gary & Gertz, Marc, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminol. 150 (1995) ....................................................13

Kopel, David B., *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALBANY L. REV. 849 (2015)..........................................9

Krouse, William J. and Richardson, Daniel J., Congressional Research Service, *Mass Murder with Firearms: Incidents and Victims 1999-2013* (Jul. 30, 2015)........................................21, 22, 23, 25

National Law Enforcement Officers Memorial Fund, *Preliminary 2017 Law Enforcement Officer Fatalities Report* ...............................28

O'Shaughnessy, Patrice, *Jealous ex-boyfriend's fury killed 87 in Happy Land fire 20 years ago*, NEW YORK DAILY NEWS (Mar. 24, 2010) .........24

PoliceOne, *Gun Policy & Law Enforcement Survey* (2013)..............................18, 26

Smith, Tom W., *A Call for a Truce in the DGU War*, 87 J. Crim. L. & Criminol. 1462 (1997) ....................................................14

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici curiae* certifies that none of the *amici* has a parent corporation and no publicly held corporation owns 10% or more of the stock of any of the *amici*.

## STATEMENT OF INTEREST OF *AMICI CURIAE*

The California State Sheriffs' Association is a nonprofit professional organization that represents each of the fifty-eight California sheriffs. It was formed to allow the sharing of information and resources between sheriffs and departmental personnel, in order to improve law enforcement throughout the state.

The Western States Sheriffs' Association was established in 1993, and consists of more than three hundred members from sixteen member states throughout the Western United States. Its mission is to assist sheriffs and their offices with federal and state legislative issues, address policy and procedural matters, and work together to keep the office of sheriff strong.

The California Reserve Peace Officers Association was founded in 1974, and CRPOA members dedicate their time to community service by working as part-time employees with law enforcement agencies both on a compensated and non-compensated basis. Approximately 600 law enforcement agencies currently employ more than 5,000 reserve law enforcement officers in California.

The San Francisco Veteran Police Officers Association is an organization

1

that represents the interests of veteran police officers in the City and County of San Francisco, including the exercise of their members' rights to keep and bear arms under the Second Amendment.

The California Gang Investigators Association was founded in 1977 to foster better relationships and networking among the various investigative units working street gangs in Los Angeles County and throughout the state of California.

The International Law Enforcement Educators and Trainers Association is a professional association of 4,000 persons committed to the reduction of law enforcement risk and to saving lives of police officers and the general citizenry through the provision of training enhancements for criminal justice practitioners.

The Law Enforcement Legal Defense Fund is a non-profit organization headquartered in Alexandria, Virginia, that provides legal assistance to law enforcement officers. It has aided nearly one hundred officers, many of whom have been acquitted, mostly in cases where officers have faced legal action for otherwise authorized and legal activity in the line of duty.

Law Enforcement Action Network is a sister organization of the Law Enforcement Legal Defense Fund. It promotes policies that protect law enforcement officers' personal and professional safety, including weaponry issues.

The Law Enforcement Alliance of America, Inc. is a non-profit, non-partisan advocacy and public education organization founded in 1992 and made up of

2

thousands of law enforcement professionals, crime victims, and concerned citizens. LEAA represents its members' interests by assisting law enforcement professionals and seeking criminal justice reforms that target violent criminals rather than otherwise law-abiding citizens.

The International Association of Law Enforcement Firearms Instructors is a non-profit association formed in 1981 whose 3,000-plus members come from local, state and federal law enforcement agencies nationwide. It conducts 20-25 police firearms training events annually, and publishes authoritative training standards and guidelines.

The following are state and local groups that promote the shooting sports, provide firearms safety training, enhance marksmanship, educate the public about firearms, and raise awareness about and defend the rights protected by the Second Amendment: Association of New Jersey Rifle & Pistol Clubs, Bridgeville Rifle & Pistol Club, Connecticut Citizens Defense League, Delaware State Sportsmen's Association, Maryland State Rifle & Pistol Association, Gun Owners' Action League Massachusetts, Gun Owners of California, Hawaii Rifle Association, Illinois State Rifle Association, Missourians for Personal Safety, New York State Rifle & Pistol Association, Vermont Federation of Sportsmen's Clubs, Vermont State Rifle & Pistol Association, Virginia Shooting Sports Association, and Western Missouri Shooters Alliance.

*Amici* believe that the perspective of front line law enforcement personnel, law enforcement organizations, and organizations that are knowledgeable about firearms should be of assistance to this Court in evaluating whether any interest in public safety is served by California's ban on the possession of standard capacity magazines holding more than 10 rounds.

## SUMMARY OF ARGUMENT

California's ban on possession of magazines capable of holding more than 10 rounds will do nothing to advance the asserted government interests of protecting public safety, reducing mass shootings, and protecting law enforcement officers from criminal attacks.

Most "large capacity magazines" are simply the standard magazines that come with ordinary, full-size semi-automatic pistols and popular semi-automatic rifles. Beginning in the 1970s, many law enforcement agencies began to adopt semi-automatic pistols instead of revolvers as their standard sidearm, and these pistols gained increasing popularity among civilians as well. Not only did they have a greater capacity than revolvers, but new designs made them safe to carry with a round loaded in the chamber. As a consequence, during the last three decades more than three times as many pistols as revolvers have been produced in this country, and it is estimated that half the magazines currently possessed can hold more than 10 rounds.

4

California banned the sale or transfer of magazines holding more than 10 rounds in the year 2000. Consequently, almost all such magazines currently possessed in California have been held by law-abiding citizens for nearly two decades without being used in crimes. Criminals and mass shooters can easily obtain magazines of more than 10 rounds illegally in other states. Section 32310 will thus affect only the law-abiding, not criminals.

Studies estimate that citizens use firearms to defend themselves against criminal attacks hundreds of thousands or perhaps millions of times each year. Criminal attackers generally plan their attacks, have the advantage of surprise, and may have multiple weapons or magazines. The innocent victim is likely to have only the number of rounds contained in a single magazine. There are documented instances in which having more than 10 rounds has been of critical importance in stopping a deadly attack. Law enforcement officers overwhelmingly believe that even a federal ban on magazines of more than 10 rounds would not reduce violent crime.

The State has not shown that banning possession of magazines over 10 rounds would reduce mass shootings. It relies on deeply flawed reports by advocacy groups, and even those reports do not show that magazines over 10 rounds are over-represented in mass shootings. By contrast, a recent report by the Congressional Research Service, using the accepted definition of mass shooting,

5

shows that magazines of over 10 rounds are used in only 9.7% of mass shootings, fewer than would be expected given the overall prevalence of such magazines. A large scale survey shows that law enforcement professionals agree that restrictions on magazines would be ineffective in preventing public mass shootings.

The State's brief does not present evidence that § 32310 would reduce killings of law enforcement officers. Instead, reliable data demonstrates that from the 1970s to the present, the time period when magazines over 10 rounds have become far more prevalent, officer deaths from shootings have declined by nearly two-thirds.

## ARGUMENT[1]

As set forth in Appellees' opening brief, the ban imposed by Cal. Penal Code § 32310 on mere possession of magazines holding more than 10 rounds should be held to violate the Second Amendment under the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

Under heightened scrutiny, the state must show either that the ban is narrowly tailored to advance a compelling governmental interest, or that there is a

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel, and no person other than *amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

tight fit between the statute and advancing an important or substantial interest.[2] The State argues that the government interest to be served under heightened scrutiny is "protecting civilians and law enforcement from gun violence, protecting public safety, and reducing the incidence and lethality of mass shootings." State Br. 2. Valid as those interests are, § 32310 does nothing to advance them.

## I. SECTION 32310 WILL NOT REDUCE VIOLENT CRIME AND WILL INCREASE THE DANGER TO VICTIMS OF CRIMINAL ATTACK.

### A. Magazines holding more than 10 rounds are not "large capacity" but are standard-issue on commonly owned, lawfully possessed pistols and rifles.

In order to put in proper context the State's claims about the use of "large capacity" magazines in crimes, including mass shootings and shootings of law enforcement officers, it is first important to understand that magazines that hold over 10 rounds are not "large capacity" but rather are the standard magazines that come with most full-size pistols, as well as with the most popular class of rifles in America.

As noted by Stephen Helsley, a veteran peace officer from the California Department of Justice who held several high level positions with that agency, law enforcement agencies beginning in the 1970s transitioned from six shot revolvers to double action semi-automatic pistols as issue sidearms. ER2428. These pistols

---

[2] *Amici* do not address the standard of constitutional review in this brief, but presume it will be a form of heightened scrutiny.

have standard magazines with capacities as large as 19 rounds. *Id.* An important reason why both civilians and law enforcement agencies widely adopted semi-automatic handguns was not only magazine capacity, but new "double action" or "striker fired" pistol designs, which means that these handguns do not have to be carried in a "cocked" state, which can be dangerous, but instead are "safe to carry fully loaded with a round in the chamber."[3] ER2408; *see also* ER2428-29.

Firearms, tactics, and police expert Massad Ayoob notes that the first Glock, the Glock 17 chambered for 9mm ammunition, established itself as "a 'service pistol' par excellence." ER2408. The Glock 17 holds 17 rounds "in its standard magazine." *Id.* Not long after, the Glock 22 was introduced, chambered for the .40 caliber S & W round. "Its standard magazine capacity is 15." *Id.* This pistol "is believed to be in use by more American police departments than any other…." *Id.* The New York Police Department issues the 16-shot Glock 19 as its predominant sidearm. ER2409. The .40 caliber Glock 23, which has a standard 13-round magazine, is the standard issue sidearm for the FBI and the Boston Police Department. *Id.* Besides being "the most popular police handgun in America," the Glock pistol is also "hugely popular for action pistol competition and home and

---

[3] Semiautomatic pistols using the older single-action design must either be carried without a round in the barrel's chamber, thus requiring the user to manually chamber a round before the pistol can be fired, or be carried "cocked and locked," which means that the pistol must rely on a safety device—sometimes fallible--to keep it from being discharged.

personal defense." ER 2410. Nearly all major handgun manufacturers produce semi-automatic handguns with standard magazine capacities over 10 rounds—Ruger, Smith & Wesson, Glock, Beretta, Heckler & Koch, Springfield Armory, CZ, SIG-Sauer, Browning, and others. ER 29-57.

The number of semi-automatic pistols sold or imported for domestic use has been rising over recent decades, resulting in both a proportionate and an absolute increase in handguns that can hold more than 10 rounds. "According to the Bureau of Alcohol Tobacco Firearms and Explosives, in 1986, 663,000 pistols were sold in the United States versus 761,000 revolvers. In 2010, revolver sales had dropped to 559,000 while pistol sales had grown to 2,258,000." ER2429. In 2015, the latest year for which data is available, 3,557,199 pistols were manufactured domestically, and only 885,259 revolvers.[4] From 1986 through 2015, a total of 48,195,129 pistols were produced, and 15,242,990 revolvers.[5] Thus, of all handguns domestically manufactured in the past three decades, more than three times as many pistols as revolvers have been produced. *See also* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALBANY L. REV. 849, 850 n.6 (2015). SER274.

---

[4] The figures reported in this paragraph do not take into account imports and exports. Far more handguns are imported than exported.

[5] BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, FIREARMS COMMERCE IN THE UNITED STATES: ANNUAL STATISTICAL UPDATE 2017, Exhibit 1.

A knowledgeable firearms industry expert has estimated "that 230 million pistol and rifle magazines were in the possession of United States consumers between 1990 and 2015." ER 2422. Analysis of governmental data supporting that estimate shows that "magazines capable of holding more than 10 rounds of ammunition accounted for approximately 115 million or approximately half of all magazines owned." *Id.*

Thus, in any crimes committed with semi-automatic firearms, one would expect half (or more)[6] to involve so-called "large capacity" magazines.

But they are not "large capacity." They are standard capacity and fully legal in the vast majority of states. By way of analogy, suppose half of American automobiles have 150 horsepower or less, and half come from the factory with more than 150 horsepower. A law is passed that arbitrarily designates any car with more than 150 horsepower as a "high powered vehicle." No one would be shocked to discover that half of all car accidents, or half of all vehicle fatalities, involve "high powered vehicles." The situation is similar with the magazines that the State labels as "large capacity."

---

[6] Crimes are more likely to be committed with firearms manufactured in recent decades.

10

### B.    A ban on magazines already possessed will not increase public safety because it will affect only the law-abiding.

Though much of the State's brief focuses on the alleged harms supposedly caused by magazines holding over 10 rounds, it is important to remember that those magazines have not been legally available to purchase in California since shortly after 1994. In that year, the federal Violent Crime Control and Law Enforcement Act banned possession, and most importantly transfer, of any "large capacity ammunition feeding device." 18 U.S.C. § 922(w)(1) (repealed).[7] However, that Act allowed the possession and transfer of those magazines that were lawfully possessed prior to the date of the law's enactment. Once existing stocks were depleted, new magazines could not be sold.

Then in 2000, California provided that any person within the state who "manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives" a magazine that can hold more than ten rounds" is guilty of a criminal offense. Cal. Penal Code § 32310(a). Greater than 10 round magazines that existed in California at that time

---

[7] Former 18 U.S.C. § 922(w) provided in part:

(w)(l) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.

(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on or before the date of the enactment of this subsection. Pub. L. 103-322, § 110103 108 Stat. 1796, 1999 (Sep. 13, 1994).

could not be legally transferred by the possessor of such magazines; he or she had to keep them.

It seems unlikely that anyone who has lawfully possessed a magazine holding more than 10 rounds for the 18 years that have elapsed since the year 2000, without committing any sort of violent crime with it, would be likely to use that magazine to "massacre civilians and law enforcement personnel," as the State's brief puts it. State Br. 53. Yet those law-abiding people are the ones who will be required by Section 32310 to destroy those magazines or divest themselves of them.

Hardened criminals, terrorists, or individuals planning a mass attack will have no trouble obtaining magazines holding over 10 rounds, should they prefer them. The vast majority of states do not regulate magazine capacity or purchases, and neither does the federal government. A person wanting to obtain such magazines to bring them illegally into California need only drive across the border to Arizona, Nevada, or Oregon. Magazines are light, small, and easy to transport. They are generally made of metal and/or plastic and don't give off odors like drugs. One doesn't have to cross international borders to get them. They are far easier to smuggle than liquor during prohibition, or drugs now.

If the constitutionality of § 32310 is upheld, it will deprive the law-abiding of a means of self-defense that may on critical occasions be needed to save

innocent life. Its effect on the ability of criminals to access such magazines would be close to zero.

### C. The magazine ban will jeopardize the ability of citizens to defend themselves against criminal attack.

The speculative harm that individuals who have safely possessed magazines over 10 rounds since the year 2000 will become mass shooters must be balanced against the very real harm that can be caused to those individuals (almost certainly numbering in the millions in California) if their ability to defend themselves or loved ones against criminal attack is impaired. Although firearms can be misused to commit crimes of violence, they can also be used by ordinary people to repel assaults by criminals, whether in the home, at a workplace, or on the streets.

The number of defensive gun uses ("DGUs") per year can only be estimated, but a number of studies have tried to do just that. Gary Kleck and Mark Gertz conducted an especially thorough survey in 1993, with stringent safeguards to weed out respondents who might misdescribe or misdate a DGU report. Kleck and Gertz found results indicating between 2.2 and 2.5 million DGUs annually.[8]

Philip Cook of Duke and Jens Ludwig of Georgetown were skeptical of

---

[8] Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun,* 86 J. Crim. L. & Criminol. 150 (1995). The Kleck/Gertz survey found that most defensive uses involved handguns, and the large majority of defensive uses do not involve firing the weapon, but merely displaying it to deter an attacker. *Id.* at 175 (80 percent of DGUs are handguns; 76 percent do not involve a shot being fired).

Kleck's results, so they conducted their own survey for the Police Foundation. That survey produced an estimate of 1.46 million DGUs.[9] The National Crime Victimization Survey (NCVS), using a much less targeted approach, estimates only 108,000 DGUs a year.[10]

The National Opinion Research Center argues that the figures from Kleck are probably too high, and from the NCVS too low; the Center argues that the actual annual DGU figure is in the range of 256,500 to 1,210,000.[11] Kleck states that by 2001 there were 20 professionally conducted national surveys of representative samples of the U.S. adult population, and all of them showed large numbers of DGUs per year, ranging from 0.5 million to over 3 million. SER52.

What is the significance of this large number of defensive uses of a firearm? As noted, most DGUs do not result in a shot being fired, and many will have shots fired that either miss unintentionally, or are intended to scare off an attacker. In other instances, several shots may be required to defeat a criminal attack. But in some cases a great many shots are exchanged. Limiting the magazine capacity of innocent people, while giving violent criminals the additional advantage of having

---

[9] PHILIP COOK & JENS LUDWIG, GUNS IN AMERICA: RESULTS OF A COMPREHENSIVE NATIONAL SURVEY OF FIREARMS OWNERSHIP AND USE (1996).

[10] Philip J. Cook *et al*., *The Gun Debate's New Mythical Number: How Many Defensive Uses Per Year?*, 16 J. Pol'y Analysis & Mgmt. 463, 468 (1997). ER249, ER256.

[11] Tom W. Smith, *A Call for a Truce in the DGU War*, 87 J. Crim. L. & Criminol. 1462 (1997).

more shots at their disposal, can have fatal results.

Attackers already have the advantage of preparation and surprise. In anticipation of a confrontation, they may be carrying multiple weapons or multiple magazines. There may be more than one attacker—that is frequently the case in robberies, burglaries, and home invasions—and all of them may be armed. Coupled with the victim's likely shock and disorientation caused by an unexpected attack, the perpetrator(s) already have an enormous advantage over the victim.

When an individual is under attack in the home, there will generally be no opportunity to gather extra magazines or firearms. ER2386. The victim trying to defend himself, herself, or loved ones, will be lucky to be able to retrieve a single firearm, and will only have whatever ammunition is already in the gun. *Id.*

It is rarely possible to know exactly how many shots were fired in an armed encounter between a law-abiding citizen and a criminal attacker, because written accounts generally do not report that information, saying instead things like "multiple rounds fired." ER2382. But there are some well-documented cases in which a large number of rounds were necessary to stop an attack and save the life of the intended victim.

The harrowing case of Susan Gonzales, recounted by Mr. Ayoob in his Declaration, is one. ER2381-82. Mrs. Gonzales and her husband were attacked by two intruders within their home one night. The attackers shot both of them multiple

15

times, but she was able to escape to their bedroom where she located her husband's semi-automatic pistol, while her husband physically fought the attackers off into the front room. Not wanting to shoot her husband, she fired three warning shots in the air, hoping that the attackers would flee. But they did not.

One attacker charged toward her, causing her to run back to the bedroom. Using her knowledge of the house, she was able to find a way to approach him from behind. She discharged seven rounds in his direction, gravely wounding him, but not immediately killing him. The wounded attacker was still able to exit the house aided by his accomplice. The other attacker re-entered the house and demanded car keys to escape. During his search for keys in the bedroom he located Mrs. Gonzalez *who was out of ammunition*. He put his gun to her temple and demanded the keys, which she gave him. "Fortunately, the attacker decided to spare Mrs. Gonzalez's life, but he could have just as easily pulled the trigger. Had she had more rounds in her magazine, maybe she would not have had to leave her fate to chance." ER2381.

Mr. Ayoob concludes:

The published account of this shooting has Mrs. Gonzalez firing three shots into the ceiling, then seven at the homicidal intruder, and then running dry. This would indicate only ten cartridges at her disposal. The gunfight occurred during the ten-year period when the Federal "high capacity magazine ban" was in force. The Ruger 9mm pistol she used, designed to hold fifteen cartridges in the magazine and one more in the firing chamber, was sold during the ten year period of that ban with magazines which could only hold ten rounds. In such a situation,

16

five more shots can make the difference between neutralizing the murderous threat, and being rendered helpless with an empty gun at the hands of a law-breaking, homicidal, armed felon.

ER2382.

This is not an isolated instance, as other examples in Mr. Ayoob's Declaration demonstrate (Baltimore man discharged 16 rounds from a handgun he was licensed to carry to successfully end an attack by three men while he was in his car carrying thousands of dollars in cash to the bank; Ronald Honeycutt, a pizza delivery man, fired 15 rounds in self-defense before the armed, surprise attacker succumbed to his wounds; Los Angeles watch shop owner Lance Thomas fired approximately 19 shots before the last of his multiple attackers ceased attempting to murder him). For these and other incidents, see generally ER2383-2385.

In deadly confrontations with criminals, law enforcement officers carry full-size magazines holding more than 10 rounds, often several of them, because greater continuity of fire contributes to officer survivability. If police officers--who have body armor, arriving backup officers, and more extensive training than most civilians—want the advantage of more ammunition in their firearms, it makes no sense to put law-abiding citizens at a disadvantage to criminals who will not obey a 10 round restriction.

As shown below in Part II, magazines holding over 10 rounds are not necessary for mass shooters, who typically plan their attacks and provide

themselves with multiple weapons and/or magazines. But the lack of one such magazine may in some cases cause deaths of ordinary people trying to defend themselves against surprise attacks by better armed criminals.

### D. Law enforcement professionals overwhelmingly recognize that magazine bans are not effective in fighting crime.

The national law enforcement organization PoliceOne conducted its Gun Policy & Law Enforcement survey between March 4 and March 13, 2013, receiving 15,595 responses from verified police professionals across all ranks and department sizes.[12] Respondents were asked, "Do you think a federal ban on manufacture and sale of ammunition magazines that hold more than ten rounds would reduce violent crime?" PoliceOne Survey, Question 6. The results were overwhelming: 95.7% (14,013) of the respondents said "no," only 2.7% (391) said "yes," and 1.6% (238) were unsure. This extraordinary consensus by law enforcement professionals that even a *nationwide* ban on magazines will not reduce violent crime is in stark contrast to the State's position that banning magazines already possessed by law-abiding citizens is somehow a solution to violent crime.

---

[12] PoliceOne, *Gun Policy & Law Enforcement Survey* (2013) (reported at http://ddq74coujkv1i.cloudfront.net/p1_gunsurveysummary_2013.pdf ("PoliceOne Survey"). A description of the study is at http://www.policeone.com/police/products/press-releases/6188461-policeone-com-releases-survey-of-15-000-law-enforcement-professionals-about-u-s-gun-control-policies/.

## II. THE STATE HAS NOT SHOWN THAT BANNING POSSESSION OF MAGAZINES HOLDING OVER 10 ROUNDS WILL REDUCE MASS SHOOTINGS OR THEIR LETHALITY.

### A. Studies relied on by the State's brief do not show that such magazines are over-represented in mass shootings.

The District Court's opinion refutes any notion that there is a tight fit between banning magazines holding over 10 rounds and any reduction in mass shootings or their lethality. ER1-66. Particularly, the District Court's opinion analyzes each shooting in the report on mass shootings prepared by Mayors Against Illegal Guns ("MAIG report"), and shows that revised § 32310 would not have prevented any of these shootings. ER28-40.

The State, citing the MAIG report, nevertheless asserts that "when LCMs are used in mass attacks, the outcome is devastating. On average, assailants who use LCMs shoot more than twice as many victims and kill 40-60 percent more victims as compared to other mass shootings." State Br. 7 (citing ER218-19, 1197).[13]

To begin with, of the 93 mass shootings in the report, there are *only seven* (7.5% of the total) in which LCMs are identified as having been used or possessed by the shooter (Santa Monica, CA, 6/7/13; Newtown, CT, 12/14/12; Oak Creek, WI, 8/5/12; Aurora, CO, 7/20/12; Tucson, AZ, 1/8/11; Binghamton, NY, 4/3/09; East Oakland, CA, 3/21/09). Rather than being disproportionately used in mass

---

[13] The MAIG report begins at ER1197. ER218-19 does not contain any analysis of the number of persons shot or killed in mass shootings using magazines of over ten rounds.

shootings, that 7.5% rate is far *lower* than one would expect given the numbers of pistols vs. revolvers produced in the past three decades, and the percentage of all magazines (about half) that hold over 10 rounds. *See* discussion in Part I., above.

Instead, the MAIG report contends in about 14 of those 93 shootings (15%), LCMs *or assault weapons*[14] were used. ER 1197.[15] In most of those cases, the shooter had multiple firearms in his possession, and when that is the case it frequently cannot be determined from the MAIG report which firearms were actually used by the shooter.

Although in the passage referred to by the State's brief, the report nakedly asserts that about 51% more people are shot when assault weapons or LCMs are involved than in other incidents, and that the death rate is about 60% higher, it provides no tabulations or supporting calculations regarding which of the incidents

---

[14] So-called "assault weapons"—a term with differing definitions in the expired federal law, and in the laws of the states that regulate them—may accept magazines of greater than ten rounds or of ten rounds or under.

[15] The original MAIG report covered the period January 2009 through September 2013. An updated version, published on the internet by Everytown for Gun Safety (MAIG's successor), reportedly said that LCMs were used in 11% of mass shootings from January 2009 through December 2016. *See* Declaration of Daniel Webster, ER 220, stating that he accessed the report in January 2017. However, the version currently posted on the internet by Everytown for Gun Safety, unlike the original report, contains *no statement at all* about the percentage of mass shootings supposedly committed using magazines over ten rounds. In any event, since magazines with a greater than ten round capacity constitute approximately 50% of the magazines in America, a finding that either 7.5% or 11% of mass shootings involved such magazines indicates that they are under-represented in mass shootings, not over-represented.

it is counting to arrive at these figures. The assertions cannot be verified without analysis by the reader of all 93 incidents, and making similar assumptions to the (unknown) assumptions made by the report's unnamed authors. The MAIG report is not social science, but propaganda by an anti-Second Amendment advocacy group.

The State also relies on website maintained by *Mother Jones* magazine as "arguably the most comprehensive compilation of public mass shootings in this country."[16] State Br. 48 n.18. Although the State's brief and the *Mother Jones* "investigation" frequently use the terms "mass shootings" and "mass public shootings" interchangeably, the distinction is highly important. A recent report by the Congressional Research Service defines "mass shooting" as a "multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and in one or more locations in close geographical proximity."[17] William J. Krouse and Daniel J. Richardson, Congressional Research Service, *Mass Murder with Firearms: Incidents and Victims 1999-2013* 13 (Jul. 30, 2015) ("CRS Report").

A "mass *public* shooting," by contrast, is defined by the CRS Report as "a multiple homicide incident in which four or more victims are murdered with

---

[16] The most recent update to this investigation (November 15, 2017) is at http://www.motherjones.com/politics/2012/07/mass-shootings-map/

[17] This is essentially the official definition used by the FBI.

firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance…." CRS Report 16. During the period 1999-2013, mass *public* shootings constituted a small subset (about 4.4 incidents per year) of the average of approximately 21 mass shootings per year. CRS Report 16. Clearly, if one wishes to reduce murder and improve public safety, examination of the much larger class of mass shootings is more relevant to those efforts, rather than focusing on rare, unlikely events.

The CRS Report looked at all mass shootings between 1999 and 2013 in which the shooters used firearms "that *could* be characterized as 'assault weapons' in that they *carried* rifles or pistols *capable of* accepting detachable magazines that *might have* previously fallen under the 10-year, now-expired federal assault weapons ban…." *Id.* at 16. (emphasis added). Despite that broad definition, and the overall prevalence of magazines over 10 rounds, such firearms/magazines were infrequently used in mass shootings. The CRS Report found that in only 31 out of 317 mass shootings were firearms that "could" be characterized as "assault weapons" carried or used. That is 9.7%, or *fewer than one in ten mass shootings*. CRS Report 16, 29.

The *Mother Jones* investigation, performed by an agenda-driven advocacy publication, is nearly useless as valid criminological or social science research. It uses a definition of "assault weapon" that has never been enacted into law by any jurisdiction.[18] It does not disclose the research credentials (apparently none) of the persons conducting it. Furthermore, it focuses chiefly on mass *public* shootings, not "mass shootings" as a whole, although the criteria for inclusion of an event as a mass public shooting are apparently quite subjective and ad hoc.[19]

All of that said, the *Mother Jones* investigation does not establish that magazines holding over 10 rounds are disproportionately used even in the cherry-picked subset of mass shootings that *Mother Jones* has compiled. The spreadsheet detailing the 95 selected shootings over the 35 years from 1982 to 2017 identifies "high capacity" magazines as present in only 8 incidents.[20]

---

[18] It employs a definition of "assault weapon" contained in a bill introduced by Sen. Dianne Feinstein in 2013 that was not enacted.

[19] "Mass shootings," including "mass public shootings," are generally distinguished from "spree" killings, in which a perpetrator kills a number of people over a period of time in various locations. CRS Report 6. *Mother Jones* admits this but then includes incidents which it classifies as spree killings. It arbitrarily excludes crimes of armed robbery, gang violence, or domestic violence, which account for most mass shootings. For some years it uses a definition of three or more individuals killed, and for other years it uses a definition of four or more individuals killed. *See* http://www.motherjones.com/mojo/2012/08/what-is-a-mass-shooting.

[20] The spreadsheet is available at http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/. It is probable that magazines holding over ten rounds were present in more than the eight identified cases. The point is that,

23

Not only does the *Mother Jones* investigation concentrate on a narrow section of mass shootings, it does not even consider mass killings by means other than firearms. The biggest intentional mass killings in the United States (apart from war) have not been carried out with firearms, but with other instruments. The 9-11 attacks (resulting in 2,977 deaths) were committed with commercial airliners.[21] The next largest intentional mass killing was the Oklahoma City attack, in which Timothy McVeigh used a truck bomb constructed from kerosene and fertilizer (168 deaths).[22] The third largest mass murder was the Happy Land Social Club arson, committed with gasoline by Julio Gonzalez in the Bronx in 1990 (87 deaths).[23] The largest killing of schoolchildren was by Andrew Kehoe, an embittered farmer who bombed a school in Bath, Michigan in 1927, killing 45 people including 37 schoolchildren.[24] The point here is not to minimize the horror and grief of mass

---

in addition to being selective, the *Mother Jones* investigation does not present reliable evidence on which to "balance away" Second Amendment rights.

[21] CNN Library, *September 11th Fast Facts*, available at http://www.cnn.com/2013/07/27/us/september-11-anniversary-fast-facts/

[22] ENCYCLOPÆDIA BRITANNICA, "*Oklahoma City bombing*," available at http://www.britannica.com/event/Oklahoma-City-bombing.

[23] Patrice O'Shaughnessy, *Jealous ex-boyfriend's fury killed 87 in Happy Land fire 20 years ago*, NEW YORK DAILY NEWS (Mar. 24, 2010), available at http://www.nydailynews.com/new-york/jealous-exboyfriend-fury-killed-87-happy-land-fire-20- years-article-1.173625.

[24] Randy Dotinga, *America's deadliest school violence? Not Columbine, but Bath, Mich., in 1927*, CHRISTIAN SCIENCE MONITOR (Jul. 24, 2012), available at

killings, but to observe that the instrument is not the problem, but the evil, depravity, and sometimes mental derangement of those who plan to kill large numbers of people.

The State contends that mass shootings are on the rise. But mass shootings (defined as four or more homicide victims in one incident) have not risen dramatically in recent years. During the 15 year period 1999-2013 there was only a very small increase in mass shootings: an annual average of 20.8 for the period 1999-2003; an average of 20.2 for 2004-2008; and an average of 22.4 for 2009-2013. CRS Report 13.

According to the CRS Report, mass shootings (four or more victims) accounted for 0.21 percent of homicide victims in the United States in the years between 1999 and 2011. CRS Report 34-35. Mass public shootings account for an even smaller proportion of overall homicides. It does not appear that magazines over 10 rounds are disproportionately used in mass shootings, or that when they are so used that they were necessary to the accomplishment of the shooter's plan. Without such proof, the State has failed to carry its burden of establishing factually that Section 32310's infringement on the Second Amendment rights of law-abiding citizens is justified by the State's expressed goal of reducing mass shootings.

---

http://www.csmonitor.com/Books/chapter-and-verse/2012/0724/America-s-deadliest-school-violence-Not-Columbine-but-Bath-Mich.-in-1927

**B.      Law enforcement professionals agree that magazine restrictions would be ineffective in reducing mass shootings.**

In the PoliceOne survey described above, a large nationwide sample of law enforcement officers was asked, "What would help most in preventing large scale shootings in public? Choose the selection you feel would have the most impact." The respondents were offered eight choices, including such things as better background checks, more aggressive institutionalization of the mentally ill, longer prison terms, and more armed guards/paid security personnel. The selection chosen by the largest percentage of officers (28.8%) was "More permissive concealed carry policies for civilians." Of the eight selections, the least effective method of preventing mass shootings was "More legislative restrictions on 'assault weapons' and ammo magazines." Only 0.9% of the law enforcement officers surveyed believed that to be the most effective solution. In the eyes of law enforcement, magazine size is not the problem, either with mass shootings or with crime generally.

**III.     THE BANNED MAGAZINES ARE NOT DISPROPORTIONATELY USED IN ATTACKS ON LAW ENFORCEMENT OFFICERS.**

The State contends that "LCMs are also disproportionately prevalent in the killings of law enforcement officers." State Br. 8.  However, to back up this claim, it cites no data, but relies upon two statements by police officers, one in Dade County, Florida, and one in San Francisco. Neither quote referred to any

26

disproportionate representation of magazines over 10 rounds in killings of law enforcement officers. The quote from the Dade County officer related to the fact that their "bulletproof vests don't match up" to "these high-powered rifles." ER1254. He did not mention magazine capacity, but referred to the well-known fact that police body armor will not protect against shots from centerfire rifles (as opposed to handguns, which generally fire less powerful ammunition). The second quotation was an assertion by a San Francisco police officers' representative in 2006 that "assault weapons" were putting officers' lives at risk, but without showing any disproportionate prevalence of those weapons or of magazines over 10 rounds in actual officer killings. ER 1256. No one wants law enforcement officers to be outgunned by criminals, but laws infringing on Second Amendment rights should be based on facts, not fears.

As noted above, police departments and civilians began to use semi-automatic handguns with magazine capacities of more than 10 rounds with far greater frequency beginning in the 1970s. The popularity of the AR-15 semi-automatic rifle platform, which also can use magazines of greater than 10 round capacity, began a little later, but it is now the most popular rifle in the United States, with sales in the many millions.

The State's brief contends that the increase in the number of magazines capable of holding over 10 rounds leads to "massacres" of law enforcement

officers. State Br. 34, 53. But the facts show that this has not occurred. According to the National Law Enforcement Officers Memorial Fund, which has tracked deaths of law enforcement personnel back to 1791, law enforcement officer deaths by firearms have been decreasing dramatically since the 1970s, the very period during which magazines with capacities over 10 rounds began to be much more numerous.

According to that group, the average annual number of officer deaths resulting from shootings in the 1970s was 127. In the 1980s it was 87; in the 1990s it was 68; in the 2000s it was 57; and in the 2010s it was 53.[25] In 2017, the preliminary data showed that 44 officer deaths resulted from firearms being used against them by criminals. *Id.*[26] Overall, the number of officers killed in the line of duty in 2017 was the second lowest in more than 50 years.[27]

Professor Gary Kleck investigated the claim by State's expert witness Daniel Webster that a study by Handgun Control, Inc. (the previous name of the

---

[25] *Preliminary 2017 Law Enforcement Officer Fatalities Report* 3, available at http://www.nleomf.org/assets/pdfs/reports/fatality-reports/2017/2017-End-of-Year-Officer-Fatalities-Report_FINAL.pdf.

[26] It should be noted that these are absolute numbers, and that this decline has occurred despite the increase in population and in the number of law enforcement officers.

[27] Christal Hayes, *Number of officers killed hits 2nd-lowest in more than 50 years,* USA TODAY, (Dec. 29, 2017), https://www.usatoday.com/story/news/2017/12/28/number-officers-killed-2017-hits-nearly-50-year-low/984477001/.

28

Brady Campaign) "purportedly indicated that 31-41% of police officers murdered in 1994 were killed with a firearm equipped with a LCM." SER74. The study was no longer available on that organization's website, or anywhere on the internet that Professor Kleck could locate. Accordingly, he examined the individual summaries on the FBI website of law enforcement officers feloniously killed in the period 2006-2015. He found no cases in which it was clear that a magazine over 10 rounds was used. SER74.[28]

Professor Kleck found seven more cases in the FBI database where it was possible that, based on the number of shots fired, a magazine holding more than 10 rounds might have been used. If these were accepted as shootings in which a magazine over 10 rounds was used, these instances would still represent only a tiny fraction of the 491 officers killed by offenders in the ten year period 2006-2015. SER75. Even if the number of murders of police by criminals using magazines holding more than 10 rounds is greater than that found by Professor Kleck, the State's brief presents no evidence of how many that would be, or whether the officers' death could have been prevented by limiting magazine capacity.

As groups consisting of or supporting law enforcement officers, the safety of officers performing their duties is of paramount concern to *amici*. But banning

---

[28] There was only one description of a magazine over 10 rounds, which was allegedly used in a .38 caliber revolver. But revolvers don't use magazines.

29

magazines holding more than 10 rounds will not achieve that goal.

## CONCLUSION

For the reasons stated above, the District Court's issuance of the preliminary injunction should be affirmed.

Respectfully submitted,

/s/ Dan M. Peterson
Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
Telephone: (703) 352-7276
dan@danpetersonlaw.com

Counsel for *Amici Curiae*

Date: January 12, 2018

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief *Amicus Curiae* of California State Sheriffs' Association *et al.* complies with Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure. According to the word count feature of the word-processing system used to prepare the brief, it contains 6,970 words, exclusive of those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the attached brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6). It was prepared in a proportionately spaced typeface using 14-point Times New Roman font in Microsoft Word.

/s/ Dan M. Peterson
Dan M. Peterson

Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2018, an electronic PDF of the foregoing Brief *Amicus Curiae* of California State Sheriffs' Association *et al.* was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

<u>/s/ Dan M. Peterson</u>
Dan M. Peterson

32